Okay, the next case on the call is 5-16-473, Interest of M.D.D., Amaya, Councilor Everson. Good morning, Your Honors. May it please the Court and Council, my name is Tim Hudspeth. I'm the appointed attorney representing the respondents in this matter, Measure Douglas D. My client requests this court reverse the trial court's August 9, 2016 order, which found that he failed to make reasonable progress to correct the conditions that were the removal of the minor child from him during a nine-month period following an adjudication of dependency. We also request this court reverse the trial court's October 5, 2016 order, which found that it is in the minor's best interest to determine my client's parental rights. A brief rundown of the facts and some relevant dates for the court. Initially, this matter began with a petition for adjudication boardship that was filed on May 19, 2014. Thereafter, there was a relatively standard family service plan put in place on June 22. On August 6, the minor was adjudicated to be a dependent. There was no adjudication of abuse, and there was also no adjudication of neglect. I think those are two important things to keep in mind. The minor was thereafter made a ward of the court, and there was a petition for termination of parental rights filed on May 25, 2016. That petition for termination of parental rights made two allegations which are relevant to us for today's purpose. One was that it alleged a failure by my client to make reasonable efforts to correct conditions that were the basis for removal of the minor from him. The other allegation was that he failed to make reasonable progress toward the return of the minor. Ultimately, on the August 9th, or following a July court hearing, the August 9th order was entered and found my client to be unfit, and his parental rights, as I mentioned, were terminated in October. The relevant nine-month period that we're focusing on for this case was from August 6, 2014, through May 6, 2015. During that time period, from approximately May 19, 2014, up through sometime in November, the record's not clear with the exact date, but up until some point in November, my client was incarcerated in the Marion County Jail on pending criminal charges. There's two issues that we present for this court's review. The first has to do with the finding of unfitness that was made in August. There's two standards that can be used to find the parent unfit. One has to do with reasonable efforts to correct the condition that led to the minor being removed from the parent. The other is the reasonable progress towards reasonable progress standard towards the return of the child during the nine-month period. In the petition, as I pointed out, there was a failure to make reasonable efforts and a failure to make reasonable progress allegation. In the trial court's order, the only standard that's reflected is the reasonable progress standard. Under the allegation that my client may have failed to make reasonable efforts, the court appears to have actually applied the reasonable progress standard to that. It correctly applied that standard, but I don't think that that's sufficient for a basis to terminate or to find my client to be unfit. If the court applies the proper reasonable efforts standard, my client would be found unfit if he failed to make reasonable efforts to correct the conditions that led to the minor's removal. Now, as I said previously, the minor was removed based on a finding and adjudication of dependency. Both parents were at the time incarcerated. Reasonable efforts would be towards removing that dependency. That dependency would be removed at the time that my client was no longer incarcerated. Under the reasonable progress standard that the court applied, it appears the court was looking for something different. I don't know if the judge was looking for something more, but it was something different than efforts towards removing the dependency. Our position is once the dependency is removed, once my client is out of the Marion County Jail, there are no more efforts that he could make to remove the reason that the minor was taken from him originally, which was incarceration. Counsel, doesn't case law allow for, as conditions change, that the court can, you know, service plans, for example, can address situations that arise after the initial commencement of the case? The case law does allow for that, Your Honor. Yes, so as things change during the case, the service plan can call for other things to be addressed. But if we look at the language of the statute that says reasonable efforts towards the removal of the condition that led to the minor being removed, that limits us to why was the minor removed and has that been taken, has that been cleared up? I do agree, judge, and correct. Case law does go beyond that, but I think statutorily we're limited or we should at least focus on has the initial condition been removed? And once it is, again, there's no more efforts. Once you get to a point, you can't make more efforts to get to that same point. Does that answer the question? That's fine. And now, of course, this court can affirm on either the reasonable efforts test or the reasonable progress test. Correct. What about the reasonable progress aspect of returning the child home? So as far as the reasonable progress, that's more of an objective test. What did this parent do? The family service plan set forth certain requirements, providing a safe home, proving a source of income, communicating with caseworkers, things like that. Once my client was released from the Marion County Jail in November, so after three months roughly of the service plan time, or I'm sorry, three months of the nine-month period has elapsed, he's got six months to get to work on this. The record shows that when he was released, there were his own medical issues that hindered him from making any further progress, or I shouldn't say from making any progress, but hindered him from making some progress. Part of the medical issue and part of the testimony, I think, that my client gave in the trial court was those medical conditions. He was recommended to limit his exposure to other people. That's, again, another reason that it would prevent him from doing and completing certain items on that family service plan. Another reason would be his caring for his elderly mother. So these are external factors that I think should at least be kept and taken into consideration when we look at what did he actually get done. There is testimony from one of the caseworkers that says, yes, he did make efforts during, he did do some things called for by the service plan during the nine-month time period. So it's not that he did nothing, he made zero progress. He didn't make, I suppose, sufficient progress for what the court was looking for. Another point to be made is that my client consistently denied the underlying allegations that led to the criminal charges being filed. He took steps to appeal certain things. The entire time he persisted in what was alleged was not true. And I think perhaps that maybe led him astray. He maybe was incorrect in that he didn't think he needed to do certain things. However, I think it is somewhat of an explanation for why didn't he do as much as maybe he could have or he should have. Also, the case law that talks about reasonable progress, and I believe this is in the case I cite, In Re, C.N., and also in the case In Re, Winn, P. It talks about when we're measuring reasonable progress, what do we look at? In those cases, particularly the C.N. case from the Supreme Court, says we don't just look at completing the family service plan requirements. There are other things that can be looked at. The family service plan is a means to the goal, the goal being reunification of the family, but it's not the only way to get to that. The family service plan really, as Your Honor pointed out, it brought up things that came along after the fact, after the dependency adjudication. So it did address the initial reason, or maybe a better way to phrase that would be in a very limited way, did it address the dependency issue. It was more focused on what was learned after the fact in these new post-dependency issues that the casework was telling me to be addressed. When you read the court's order, particularly the August order that finds my client to be unfit, the court focuses almost exclusively on the elements of the family service plan. Under Gwen P. and C.N., I think that this court would find that to be error because there are other things that the court could have considered, perhaps other things that the court should have considered under the reasonable progress standard that would show while my client didn't check off every item on a certain list, he certainly was making progress towards addressing things that needed to be addressed. Under the reasonable effort standard, as I mentioned, I think once he was released from the Marion County Jail, once the basis for the adjudication of dependency was removed, I think he had reached that end goal, and that would be more significant than the items on the family service plan. Under the reasonable progress standard, once he was released from jail, he had these other issues that ultimately did hinder his ability to complete and to make further progress called for by the family service plan. The second issue that we have deals with the best interest finding, which was in the court's October 5th order. The court went through each of the statutory factors in relative detail, and for the most part found that those were in favor of terminating parental rights. There's other factors, however, that can also be considered in addition to the statutory factors, and I think it's also important to point out beyond the consideration of factors, what is one of the goals of the Juvenile Court Act, and that being to preserve and strengthen the minor's family ties. Termination of parental rights is a last resort. It's not something that just because one situation is better for the minor than another, that's not good enough to terminate the parental rights. There needs to be harm, some sort of threatening harm, something about the parent's environment that is detrimental, dangerous to the minor, not just that this place is better than the other place. We're not asking, we're not saying anything about the foster parent's involvement. Everything seems that they have been fantastic caregivers for this child, but when we're taking the drastic step of terminating parental rights, we need to make sure that it's not just because one situation is better than the other. You have a counsel that the first stage was unfitness, right? The first stage is the unfitness, correct. So at the point where you get the court looks at best interest, I mean, there is a way. I mean, the test is what's best for the child. Correct. It's what's best for the child, but I don't think the focus is solely on is one situation more ideal than the other. I'm not sure. I understand what the court is saying, Your Honor, but there's more to it than just is this house better than that house. It is an overall assessment of what is best for that minor. Part of those considerations are family ties, natural family ties to the birth parents and things of that nature. So in conclusion, Your Honor, we are asking that the trial court's finding of failure to make reasonable progress and also if there's an implied finding of failure to make reasonable efforts, that that August 9th order be reversed and also the October's 5th order, which ultimately terminated parental rights, that that also be reversed. Thank you. Good morning, Your Honor. I'm the appeasement court counsel. My name is Patrick Bailey. I'm an attorney for the state with the Office of the State's Attorney's Appellate Prosecutor. This court's standard of review in both the fitness stage and the best interest stage is whether the court's findings were against the manifest weight of the evidence. In order for this court to find a finding to be against the manifest weight of the evidence, this court has to find that an opposite conclusion is clearly evidence or that the lower court's findings were unreasonable, arbitrary, and not based upon the evidence. And I think when we look at the facts of this case and the evidence that's presented, it is manifestly apparent that the court's conclusion was correct and certainly not contrary to the evidence in this case. As Justice Overstreet indicated, the state needs only to prove one allegation of unfitness. And here there were two, that the respondent failed to make reasonable progress, the nine months of adjudication of, in this case, dependency, and whether the respondent made reasonable efforts to correct the conditions that led to the initial finding of dependency. Their initial finding of dependency resulted because the mother of the child was incarcerated in state prison and the father was arrested on methamphetamine charges for what I believe in periods of a vehicle-type stop and then was in jail at the time, so there was no caregiver for the child. So the child was then brought before the court. The child's case was brought before the court for purposes of a dependency hearing. And that is what initiated the ultimate finding of adjudication and the involvement of the state in the establishment of service plans for the respondent. Now, counsel argues that, well, it's error for the court to focus on the respondent's compliance with the service plans. And I would note before continuing that regard that the statutory requirement is very explicit in that the court is limited to consideration of evidence within the statutory nine-month time period. So in this case, counsel correctly identifies that nine-month time period being from August 2014 to May of 2015. Now, counsel argues that, well, the court would err in focusing significantly upon or primarily upon the respondent's compliance with the service plans. But you're not going to know when you look at the statute if the statute itself is explicit that compliance with the service plans is the factor or its principal factor or a factor that the court may properly rely upon in ultimately making a determination of whether the respondent made reasonable progress or made reasonable efforts. Now, it is true, and you'll note that there is some argument on this in the court below, that the trial court actually had to respond to be shifted the time, nine months, to exclude the jail time that the respondent was incarcerated, which was from August to about November or so. Both parties essentially agreed that the court had not done that properly, that, in essence, the case that the state cited states that the time of incarceration does not hold the initiation of the nine-month time period. And I emphasize that that doesn't necessarily make that fact irrelevant in the grand context of the proof, but it doesn't, you know, give a free pass to the respondent for that time period and then we measure it from point A to point B. However, in this case, we have nearly a six-month time period in which the respondent was not incarcerated. And the evidence demonstrably shows that during that long time period, the respondent more or less didn't do anything. Now, I believe that the testimony was that he did make some efforts with regards to finding housing, but there were other requirements which were to engage in parental education and parenting classes and to obtain a substance abuse evaluation and follow-up treatment. With regards to the latter two, he hadn't made any efforts whatsoever, and that would include even attempting to make a contact to set up the intake or assessments. These types of processes usually involve, you know, an initial interview or initial establishment of a treatment plan and then the treatment plan itself. In the six-month time period, nothing happened. Now, you get a lot of juvenile cases before this court. I know I argue a lot, and you get a lot more than I argue, I'm sure. So a lot of these cases go on for years, okay? This is a—we have a six-week-old child I was taking into. So when we talk about a six-month time period, we're talking about basically a huge chunk of this child's life at this point that the respondent had not made any progress in attempting to even start the requirements of the service plan. Now, we hear a lot in the argument today about his health problems. He was caring for his elderly mother. These are all true facts, and I don't—I'm not—I don't think anyone should be unsympathetic to those particular problems. They are—they do not relate really in two ways. Number one, to whether he made reasonable efforts, because that's a subjective standard which we look at the particular respondent's personal circumstances to assess whether or not reasonable efforts were made. Reasonable progress, however, is an objective test, which is strictly defined by the amount of actual progress that the respondent had made towards completion of the service plan and correcting the conditions which led to the minor being placed in dependent care. Now, this is probably a good point to get to the argument being made by the respondent, that, well, once the basis for the dependency finding is removed, that somehow ameliorates, you know, the respondent's duties or responsibilities later on. And, in fact, that kind of mindset is sort of reflected in testimony presented below where the respondent had made statements to the caseworker that, well, my charges were dismissed, and so, you know, that the problem's gone, I shouldn't have to do anything, I don't have any problems, et cetera. Number one, there's no authority that I could find that actually states that, you know, a change in circumstance which led to the initial finding of adjudication somehow ameliorates at some later point your duty to comply with service plans, okay? Number two, not only is there any appeal that was ever taken of the adjudicatory order, so when we talk about an argument that legally the respondent would come in and say, well, now look what happened, I should be able to go back and, you know, in essence, arguing that the adjudicatory finding is no longer valid, which is sort of cut off the necessity for the service plans, it's sort of a backdoor way of appealing without actually having to appeal the adjudicatory finding, and there's certainly no authority that would allow for that, and, frankly, it's illogical. But number three, I think just as important, when the charges were dismissed, excuse me, the respondent was released from jail, we don't know why that happened. I mean, there's a lot of reasons why charges are dismissed, and they have nothing to do with exoneration as a way it's described in the appeal. Here, it may have a lot to do with whether or not the state has some evidentiary problems with regards to maybe a motion to suppress. You know, we have a vehicle stop and a vehicle search, and there was some reference in the hearing below about drug paraphernalia being found in the diaper bag in the car. So, you know, I don't want to speculate necessarily too much on that, other than to state that it is not, you know, a foregone conclusion that the dismissal of a charge equals your innocence of the charge, but that appears to be the particular position that the respondent is taking. Okay? And finally, there's a different standard of proof in an adjudicatory hearing. Okay? It's a preponderance of the evidence. All right? So, you know, we don't know. That's a significantly lower standard of proof than you would have in a criminal trial. Now, there's no hearing where we established, you know, the actual events of the stop, but I do think that we take that one consideration into all others to come to the conclusion that simply stating that a user leaves from jail and, therefore, his compliance with service plans requirement is lessened or foregone just doesn't make any legal or logical sense. So, from a reasonable progress and reasonable effort standpoint, I believe that the evidence was clear and convincing and that he had not made any progress, or really any sort of reasonable progress, or any real efforts as well in the testimony that he actually tried. He did have a lot of problems, but it wasn't established exactly the one way that specifically that hindered his ability to engage in the services of his preliminary. So, then we move to the best interest stage. And, again, it's the same standard interview to manifest away the evidence. In that regard, as the Court notes, the focus shifts from the respondent to the child, to the best interest of the child, and the best interest of the child is the paramount consideration at that point. In this case, the Court will know that there was a hearing, there was testimony from their foster parents, the Jorns, who are a very impressive family. They provided a very nurturing and healthy environment. The minor was excelling developmentally. It was safe and secure. They were well-bonded, referred to the Jorns as mother and father, mommy and daddy. They're two biological siblings of the Jorns that the child had bonded with, siblings that bonded with the child. She was getting a very impressive manner of daycare. They run the college where Mr. Jorn was employed as a professor in business courses. This is one of those cases, Your Honor, I'm happy for it. The respondent, Douglas, is, it seems like a decent man. We get cases where we see foster parents that are just really hard to swallow. He's not one of those individuals. I think he has problems that he has to overcome. But there is a little doubt now that anyone in this case would disagree that he had real affection for his daughter. Nonetheless, when we talk about the best interest, we do have to weigh, and like I sort of dispute counsel at this point, we are weighing particular circumstances because the Court has to weigh the determination of the best interest. Now, the Court here went through the statutory factors. I'm not going to belabor this argument by going through all of them again. This Court will see it because the Court below made a very specific and detailed written order addressing all of these considerations. But they weigh extremely much in favor of the Jorns. Now, Douglas had not yet completed his counseling. He had not yet completed the parenting classes. He was trying. Although we don't look past the first nine months when we talk about the fitness stage, it certainly can come into consideration at the best interest stage. So we can see that he's trying, but he's still a long ways away. Plus, he had two positive drug drops after the initial nine-month time period, which is obviously an additional cause of concern. Now, Douglas had testified that they were related to legal drugs that he was taking, the imputation being that it was a false positive, but there was nothing to substantiate that. The drug test was a drug test, and they tested positive. So when the Court looks at these respective circumstances, in addition, I have to point out that the respondent had gotten housing, but it was a one-bedroom residence. In fact, the minor's bedroom, such as it was, was basically the laundry room. A sheet was thrown up over the washer and dryer, and here's the bed. And that was considered by caseworkers, for me just, I think, as involved here, as not being really a sufficient and safe environment for a child of that age to be residing. So, again, when we look at that particular circumstance, amongst others, when we look at the respective circumstances and the child's sense of attachment and the care and affection, and the fact that this child, at this point, had been in foster care for the duration of this child's life, the Court made a determination that permanency was also an important consideration as well. So the case is weighed heavily in favor of the trial court's ultimate finding that termination was in the minor's best interest. So I'd ask this Court to affirm the Circuit Court both in its finding of unfitness and ultimately its finding terminating the respondent's criminal rights. Does the Court have any questions for me, Your Honor? Thank you very much. Your Honor. Thank you, Your Honor. Counsel, I did it on the best interest, so I'll start with that since it's more fresh in the mind. When we're looking at what is, which situation is best, and this is getting back to Your Honor's question to me, I think what we need to keep in mind is it's not just which situation is necessarily best, but will the minor be able to thrive under either scenario, under either situation? Will the minor be safe, be provided for, and be taken care of under either scenario? There is no indication in the record that the minor would be in any more danger. Under the best interest portion of the record, there's no indication the minor would be in any more danger with the respondent, that the minor would not develop, grow, thrive with the respondent, that the minor would be any less loved or cared for with the respondent than with the foster parents. So that's, I think, something the Court should keep in mind, is there's no indication things are going to be bad with the respondent if he still has the child. As to the housing, there was testimony that I think a caseworker came to the respondent's home, recommended some certain changes to be made. My client testified, hey, I made those changes. She thought it would be better, so okay. This is what it was, now this is what it is now, which made his home better suited for the minor. Back to the fitness stage. As it relates to the nine-month time period and the three months while my client was incarcerated, just to be clear, we're not saying that there isn't a tolling of that nine-month period. That's not an argument that we're making. Case law is clear that doesn't happen. But it is a consideration what services were available during that time of incarceration. That is something that the Court can keep in mind to consider. There was a mention of change in circumstance doesn't negate the family service plan, doesn't negate the underlying adjudication of abuse, neglect, or dependency. And I would submit that that's true. But in this case, that change in circumstance was the sole basis for the adjudication of dependency. So we're not talking something insignificant. We're talking the only reason that minor was removed. There was discussion on the underlying criminal charges and that they were dismissed and that doesn't equal innocence. Again, that's not an argument that we're making. But the criminal charges and the resulting incarceration was the basis for the finding of dependence. So while dismissal is not innocence, dismissal is, or at least from jail, by the way, is removal of that basis for dependence. As to the efforts that the respondent made, again, one of the Caritas caseworkers clearly testified, yes, he is making efforts. He is trying. So it's not that nothing is taking place. He was doing what he was able to do under the circumstances, which is relevant for the reasonable efforts analysis, under the reasonable progress analysis. The goal is not simply check off every item on the list. The goal is working towards reunification of that family.